front door. (3-275). Around 10:00 pm the police entered her house to secure it and wait for a search warrant. (3-277). The police instructed her to remain on the couch in the living room until the warrant arrived. (3-277). She sat on her couch for three or four hours waiting for the warrant. (3-277). The police brought a big black dog into her house to assist in the search. (3-278). The police searched her house until about five or six o'clock in the morning. (3-280). When the police were unsuccessful in finding any evidence, they spoke to her and asked her to retrieve certain things. (3-280). When asked, Ms. Josselyn told the police that she had a weapon in her house and showed them where it was. (3-281). She told the police and the jury that she had a permit to carry a gun, that she kept the gun unloaded and that she kept the bullets separate from the gun. (3-282). In addition, the police asked Ms. Josselyn about a hat which she retrieved and gave to the police. (3-283). The hat she turned over to the police was a navy blue cap with the words "Project Joshua" on it. (3-283). She had never seen her husband wear that hat because it was at the bottom of her closet. (3-284). She told the jury that her husbands owns a black and purple windbreaker and that the last time she saw it was the week-end before his arrest. (3-284). Ms. Josselyn told the jury

that she and her husband both owned cars. (3-268). She drove a 1986 Ford AeroStar van and her husband drove a white 1987 Chrysler LeBarron. (3-268). The Chrysler LeBarron had two New Hampshire license plates on it, one in the front and one in the back. (3-269). Ms. Josselyn noticed that when she went to retrieve the LeBarron from the police, one of the license plates was missing. (3-269). Ms. Josselyn told the jury that she had observed her husband drive on many occasions, and that he always drives with his glasses. (3-271). In fact, Ms. Josselyn testified that her husband needs his glasses to drive. (3-271). Ms. Josselyn told the jury that both she and her husband frequented the Home Depot in Tewksbury looking for bargains. (3-271). Ms. Josselyn recalled that sometime on September 26, 1996, she telephoned her friend, Patricia Reardon because she was upset. (3-273).

On cross-examination, Ms. Josselyn told the jury that on Sunday, September 22, 1996, she left the house between 7:00 am and 8:00 am and that her husband was sleeping when she left. (4-5). The prosecutor attempted to impeach Ms. Josselyn with her statement that she lived with David Josselyn for five years. (4-8). In refreshing Ms. Josselyn's testimony from the previous evening, the prosecutor told Ms. Josselyn that she had previously

testified that she lived with her husband for five years, when in fact, she testified that she was married to David Josselyn for five and a half years. Although she had been married to him for five and a half years, he was in jail for over four of those years and she actually lived with him for less than eight months. (4-8). During this exchange, the prosecutor reminded Ms. Josselyn of her oath to tell the truth and then said, "I want you to tell the truth. I want you to look at the jury and tell the truth." (4-8). The prosecutor impeached Ms. Josselyn with a statement that he attributed to her that her firearms permit was active on September 23, 1996. (4-25). She in fact never told the jury that she had an active firearms identification card. (4-25). Her license had expired. (4-25).

Patricia Reardon testified that she was a friend of Eva Josselyn and that she lived at 42 Water Street in Fairhaven, Massachusetts. (4-36). She is employed as a research analysis at Thompson and Thompson, a trademark industry cooperation. (4-37). She also knows David Josselyn and has known him for a couple of years. (4-37). Reardon testified that on September 22, 1996, David Josselyn came to her house in Fairhaven sometime in the morning to do some odd jobs. (4-37). Specifically, she

23

recalled that he hooked up her VCR, her television and her stereo. (4-37). In addition, he installed dead bolts on her doors and had replaced a light bulb that had broken off in the socket on her porch. (4-38). Reardon recalled that David Josselyn arrived at her house between 8:30 am and 9:00 am and left around 12:30 pm. (4-38). She then recalled speaking with Eva Josselyn on either September 26th or 27th, 1996. (4-39). She recalled that Eva was very upset and crying. (4-39). After Eva explained the problem, Reardon told Eva that Josselyn could not have been involved in anything because he was at her house. (4-40).

On cross-examination, Reardon said she remembered that Josselyn was driving his wife's van on September 22, 1996, when he was at her house. (4-41). Reardon explained that she did not inform the police of Josselyn's whereabouts because she was not sure which police department was involved. (4-43).

At the close of the defendant's case, trial counsel again moved for a required finding of not guilty. (4-45). In addition, trial counsel moved to strike the in-court identification of Josselyn by the Commonwealth's witnesses because the Commonwealth failed to inform the defense that they would attempt to have the witness identify the

24

defendant at trial. (4-47). The court denied both motions. (4-47).

THE CLOSING ARGUMENTS

During his closing argument, trial counsel again conceded that the Commonwealth proved that the bullet retrieved from the Sunoco was fired from the gun recovered from the Josselyn residence. (4-75).

The prosecutor mocked the defendant and his wife for what he characterized as their attempt to portray themselves as victims. (4-81). Then the prosecutor appealed to the sympathy of the jury when he commented that the only victims of this case were the hardworking clerks and cashiers trying to pay for college or to feed their children. (4-82). On several occasions, the prosecutor referred to the defendant's case as what the defense is "trying to sell you."(4-82,83, 84,85,86). The prosecutor then told the jury that the string of coincidences that the defense was selling cannot be believed because the defense conceded that the gun retrieved from the Josselyn residence and then returned to the Josselyn residence was the gun that fired the bullet into the wall at the Sunoco. (4-86). Then the prosecutor shifted the burden of proof when he told the jury that all of these things the defendant's trying to sell you must be true for you to find the

25

defendant not guilty. (4-87). The prosecutor again shifted the burden of proof when he commented on facts not in evidence when he told the jury that the defendant went to the Osco drug wearing a jacket that just so happens to match the one the defendant owned but his wife had not seen since just after the robbery. (4-83). The prosecutor also argued to the jury that the defendant had used the same car in all three robberies. (4-86). No such evidence was presented at trial.

After the prosecutor's argument, trial counsel objected to the prosecutor's fabricated evidence relative to the matching jacket, as well as his fabricated evidence that the same car was used in all three robberies. The court concluded that the prosecutor was within his rights to argue inferences that the same jacket and same car were used in all three robberies, despite the lack of any direct evidence. (4-95).

THE CHARGE

The trial judge instructed the jury that they should keep in mind that an innocent mis-recollection is not an uncommon experience, and that in weighing discrepancies in the evidence, the jury should determine whether the discrepancies pertain to a matter of importance or an unimportant detail. (4-105). Additionally, the trial judge

26

instructed the jury that they should determine whether the discrepancy was intentional or innocent. (4-105)

ARGUMENT

I. **THE STATE COURT'S DECISION DENYING JOSSELYN RELIEF ON CLAIMS INVOLVING THE ERRONEOUS ADMISSION OF IDENTIFICATION, PROSECUTOR'S PREJUDICIAL ARGUMENTS AND THE TRIAL COURT'S ERRONEOUS JURY INSTRUCTIONS SHOULD BE REVIEWED DE NOVO BECAUSE THERE WAS NO ADJUDICATION ON THE MERITS OF JOSSELYN'S FEDERAL CLAIMS.**

In order for the "presumption of correctness" to apply, a state court decision must:

1. be the product of a fair state court "adjudication" of the federal legal issue;
2. be the product of a full state court adjudication in that it addresses not only the claim but also the issues of federal law; and
3. have resulted in a decision.

The state court decision is not entitled to any presumption or consideration if the state's adjudication was distorted by mistake, or completely disregarded Supreme Court case law. See e.g., Hameen v. Delaware, 212 F.3d 226, at 247-48 (3rd Cir. 2000)(state court's decision was not adjudicated on merits because analysis was distorted by mistaken view that the Supreme Court had already rejected identical

27

argument); Hogan v. Gibson, 197 F.3d 1297, 1302 n.2 1305-6 (10th Cir. 1999)(Oklahoma state court's analysis of jury instruction claim under Beck v. Alabama, 447 U.S. 625 (1980), constituted such "gross deviation from, and disregard for," the Court's rule in Beck that it cannot constitute "adjudication of Hogan's Beck claim on the merits." Since the state court did not decide the claim on its merits, we review the district court's conclusion of law de novo and factual finding, if any for clear error.").

As such, if the state court's decision is not a fair "adjudication," the federal court is free to review the state court's legal decisions de novo. Miller v. Johnson, 200 F.3d 274, 281 n.4 (5th Cir. 2000). The Supreme Court has specifically addressed this issue and held that the limitation of review in AEDPA cases pursuant to 28 U.S.C. § 2254(d)(1) applies only to issues that have been "adjudicated on the merits in state court and review is de novo when there has been no clear adjudication on the merits." Id.

In the Fifth Circuit, the Miller court set out three factors to consider when evaluating whether the state decision is a true "adjudication" on the merits of a petitioner's claim: (1) review what state courts have done in similar cases; (2) consider whether the case history

28

suggests that the state courts recognized any ground for not resolving the case on the merit; and (3) consider whether the state court's opinion suggests reliance on procedural grounds rather than adjudication on the merits. Id. The Supreme Court adopted the Miller factors in Jackson v. Johnson by denying a certiorari petition by the government after the federal court concluded, using the Miller factors, that the state court decision was not an adjudication entitled to any deference pursuant to 28 U.S.C. § 2254 (d)(1). Jackson v. Johnson, 194 F.3d 641, 651 (5th Cir. 1999) cert. denied 120 S.Ct. 1437 (2000).

Here, because the state court failed to address Josselyn's federal claims of constitutional violations regarding erroneously admitted identification evidence, the prosecutor's improper and prejudicial closing argument and the erroneous jury instructions, there was no adjudication on the merits of this claim as defined by 18 U.S.C. § 2254(d)(1). As such, this court should review these legal claims de novo.

II. **THE STATE COURT VIOLATED JOSSELYN'S RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHERE THE STATE COURT AFFIRMED JOSSELYN'S CONVICTION BASED UPON ERRONEOUSLY ADMITTED IDENTIFICAION EVIDENCE. (GROUND ONE).**

29

The witnesses, one of whom was a police officer, were no more likely than the jury to determine correctly whether the individuals in the video surveillance images were the same person and whether either of the individuals was Josselyn. The sole issue in this case was identification of the perpetrator. The defense was mistaken identity. The Commonwealth's theory was that Josselyn committed three robberies in the same day all within the same area, dressed in the same clothing and driving the same car. The Commonwealth secured surveillance photographs and video from two of the three robberies. Two of the three victims could not identify Josselyn at trial. The state court violated Josselyn's right to a fair trial and due process of law as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when the court permitted lay witnesses to identify the person in the videotape and surveillance pictures as Josselyn. Because the witnesses in this case had no familiarity with the person depicted in the surveillance images, it was error to admit lay witness testimony as to whether the same person was depicted in two separate surveillance images and as to whether that individual was Josselyn.

A fundamental premise of our criminal trial system is that "the jury is the lie detector." United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973) cert. denied, 416 U.S. 959 (1974). When reviewing the admission of lay opinion testimony on identification, the level of familiarity of the witness with the person shown in the photograph is a factor for the court to consider. See, e.g., United States v. Barrett, 703 F.2d 1076, 1085-86 (9th Cir. 1983) (witness was defendant's girlfriend); United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir. 1984)(one witness had met with the defendant at least seventy-five times; another about twenty times); United States v. Wright, 904 F.2d 403, 405 (8th Cir. 1990; United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir. 1993) (error to admit testimony where witness did not know defendant and had never seen him in person); United States v. Jackman, 48 F.3d 1, 6-7 (1st Cir. 1995); United States v. Pierce, 136 F.3d 770, 775 (11th Cir.), cert. denied, 525 U.S. 974 (1998); United States v. Allen, 787 F.2d 933, 935-936 (4th Cir.1986), vacated on other grounds, 479 U.S. 1077 (1987)(witnesses had known defendant for some time); Commonwealth v. Pleas, 49 Mass.App.Ct. 321, 325-326 (2000).

Of the cases cited, federal courts have allowed limited lay opinion testimony on the issue of

identification when the witness knew the defendant prior to the crime. For example, in Jackson, the witness had met the defendant at a Christmas party four months before the robbery. 688 F.2d at 1123. In Allen, one of the witnesses was a parole officer who identified a defendant that used to be under his supervision. 787 F.2d at 935. Furthermore, identification testimony from a person known to the jury to be a police officer increases the potential for inappropriate prejudice to the defendant. Id.

In this case, McEnaney knew neither the person(s) in the videotapes, nor Josselyn. The error is even more egregious with respect to McEnaney because McEnaney is a police officer, a fact known to the jury. His testimony that the same person was featured in both videotapes and his subsequent inference that that person was Josselyn, resulted in the same prejudicial effect as if he had testified that he knew Josselyn. There was a risk that the jury would infer either that the Josselyn had a criminal history, or that McEnaney had an expertise in identification of individuals on surveillance tapes. This testimony was erroneous and prejudicial. United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973), cert. denied, 416 U.S. 959 (1974).

32

In this case, none of the lay witnesses or the police officer knew Josselyn. Identification was a major issue. Two eyewitnesses, Irene Anderson, from the Osco Drug, and David Evans, from the Sunoco, were unable to identify Josselyn as the person who robbed them. Yet, the Court allowed three witnesses to give their opinion that Josselyn was depicted on the surveillance images committing the robberies. These witnesses were Detective Thomas McEnaney (2-119), James Sanford (3-63), an employee at the Home Depot in Tewksbury, and James Crocker (3-25,27), a college student and part-time cashier at the Home Depot. The surveillance images were taken at the Osco Drug and the Sunoco gas station. McEnaney, Crocker and Sanford were not present at either the Osco Drug or Sunoco when the surveillance images were created during the robbery. There was no surveillance tape of the robbery at the Home Depot. McEnaney, Crocker, and Sanford had no history of familiarity with the individual(s) depicted in the surveillance images. McEnaney, Crocker and Sanford had no history of familiarity with Josselyn. McEnaney, Crocker and Sanford were no more competent than the jurors to view the images from both surveillance tapes and decide whether or not the same person was depicted, and, if so, whether that person was Josselyn. The sole purpose of McEnaney and

Crocker's testimony on this issue was to give the Commonwealth's strongest witnesses the opportunity to endorse its theory that Josselyn robbed all three businesses.

The Supreme Judicial Court denied relief to Josselyn erroneously claiming that "none of the witnesses in question were ultimately permitted to identify the defendant directly, but merely described his clothing and a few physical features." (Opinion p.3). This finding is not supported by the evidence. In fact, both Crocker and Sanford identified Josselyn as being the individual on both surveillance images. (3-25,27,63,71). Crocker testified that the man who robbed him was depicted on both tapes, and that it was Josselyn who robbed him. (3-25,27). Sanford told the jury that the person on both tapes looked like the same person who robbed the Home Depot.(3-63,71). As such, the evidence is clear that the witnesses identified Josselyn from the video. The state court failed to evaluate Josselyn's claim that his federal rights were violated by this erroneous identification. Because the state court failed to evaluate Josselyn's federal claim there is no "adjudication" within the meaning of 28 U.S.C. sec. 2254, and this court is free to review this claim de novo.

34

In addition, although Detective McEnaney did not directly testify that the person in the surveillance images was Josselyn, the implication was clear. McEnaney testified that he was sure the same person robbed both places. (2-119). The clear impact of this testimony was for the jury to infer that the same person robbed Crocker and was depicted on both surveillance images: Josselyn. No other plausible explanation exists. Yet the state court incorrectly claimed that McEnaney's testimony was stricken by the trial judge. <u>Commonwealth v. Josselyn</u> (Unpublished p. 2). In fact, the state trial judge did not strike Detective McEnaney's answer to the prosecutor's question about the similarities of the person depicted on the video. (II-119-120).

> McEnaney answered: "They were very similar-same suspect, same clothing, hat, same method of operation." (II-119). There was no objection by trial counsel. Then the prosecutor asked:
>
> Q. And that was apparent on the videotape to you, sir?
>
> A. Yes.
>
> MR. COLLINS: Objection, Your Honor, speculation.

35

>     THE COURT: Objection sustained. The answer
>     will be - -
>
>     MR. COLLINS: Move to strike. THE COURT: - -
>     ordered stricken.
>
>     Q. After you viewed those videotapes, sir -
>     -
>
>     THE COURT: you will have those videotapes to
>     observe, and any opinion again is an opinion
>     for you to draw or not draw." (II-119).

Contrary to the state court's findings, the trial court never told the jury to disregard McEnanery's testimony that the two video's depicted the same suspect, same clothing, hat and method of operation, because there was no objection to the question. The objection was to the questions as to whether the similarities of the two suspects was "apparent" on the video. (II-119).

The jury was in as good a position as the witnesses to evaluate whether it was Josselyn on either of the tapes. It was error to admit this testimony. LaPierre, 998 F.2d at 1465.

Moreover, Josselyn's convictions must be reversed because three witnesses offered their opinion that Josselyn robbed all three stores in a case where the suspect's identity was the ultimate issue. Questions grounded in

36

previously admitted evidence may be posed to an expert witness, even if the reply touches on the ultimate issue, as long as the witness does not directly express his view on the defendant's guilt. <u>United States v. Young Buffalo</u>, 591 F.2d 506 (9th Cir), cert. denied, 441 U.S. 950 (1979). In this case, the witnesses were not experts, and thus should not have been allowed to testify as to their opinions of what was depicted in the surveillance tapes. Cf. <u>United States v. Robinson</u>, 544 F.2d 110 (2nd. Cir. 1976), cert denied 434 U.S. 1050 (1978). Even if they had been experts, their testimony did more than approach the ultimate issue. Their testimony addressed it head on. The opinion testimony was not limited to whether the hat and jacket was the same in each of the tapes and the same as the items in evidence. The testimony wasn't even limited to whether the person in the two tapes was the same person. The testimony went to the ultimate issue: "Was it the defendant?" Because the testimony was given by non-experts, in no better position than the jury to make an identification, and went to the ultimate issue, it was inadmissible and the convictions, therefore, must be reversed. <u>Snowden v. Singletary</u>, 135 F.3d. 732 (11th Cir. 1998). The trial court erroneously permitted the three witnesses to provide their opinion as to the defendant's

37

guilt. The state court erroneously claimed that none of the testimony from the three witnesses "was directed to the ultimate issue of the defendant's guilt." (Opinion p. 3). In order to reach this conclusion, the state court had to ignore the testimony of McEnaney,(II-119), Crocker (3-25,27), and Sanford (3-63,71). The witnesses' failure to state the exact phrase "Josselyn is guilty," cannot be the deciding factor as to whether Josselyn's rights to due process and a fair trial pursuant to the Sixth and Fourteenth Amendment to the United States Constitution were violated. Crawford v. Washington, 124 S.Ct. 1354 (2004). The inference was clear. According to three witnesses, Josselyn robbed the three stores. The state court's erroneous findings completely ignored Josselyn's federal claim on this issue. As such, there was no adjudication on the merits of Josselyn's federal claim sufficient to satisfy the requirements of 28 U.S.C. § 2254. Therefore, this Court may review this claim de novo.

III. **THE PROSECUTOR'S COMMENT THAT THE SAME JACKET AND SAME CAR WERE USED IN ALL THREE ROBBERIES MISSTATED THE EVIDENCE AND VIOLATED JOSSELYN'S RIGHT TO A FAIR TRIAL PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (GROUND II).**

A prosecutor is permitted to argue the evidence and

38

the reasonable inferences that may be drawn from that evidence. However, the prosecutor may not misstate the evidence. Davis v. Zant, 36 F 3d. 1538 (11th Cir. 1994).

Here, the prosecutor misstated the evidence on at least two occasions.  First, the prosecutor told the jury that Josselyn wore the same jacket in all three robberies. No such evidence to support this claim was presented at trial.  The prosecutor then fabricated evidence about Josselyn's car telling the jury that Josselyn used the same car in all three robberies.  In fact, only one witness from the Home Depot robbery ever described the vehicle that the suspect fled in.  No evidence whatsoever was presented as to what vehicle the suspect was driving in the Osco Drug robbery nor the Sunoco robbery.  No evidence supported even an inference that the same vehicle was involved in all three robberies.

The prosecutor's fabricated evidence that Josselyn's jacket and vehicle were used in all three robberies is a clear misstatement of the evidence intended by the prosecutor to undermine the defense theory and to mislead the jury into believing that, if they believed that Josselyn was involved in one of the robberies, they could infer he was involved in the other two indictments for robbery.

39

Not only was the prosecutor's allegations false, but they also relieved the Commonwealth of their burden of proving each and every element of each robbery beyond a reasonable doubt.

Here, trial counsel objected but the judge did not cure the prosecutor's error with an instruction to the jury. The prosecutor's excessive fabrications linking Josselyn to all three robberies relieved the Commonwealth of their burden of proving each and every element of the indictments beyond a reasonable doubt. Because the Commonwealth's theory was that the same person robbed all three stores, the prosecutor's fabrication of evidence linking the three crimes went to the heart of Josselyn's defense of mistaken identity. The cumulative effect of the prosecutor's ill-advised rhetoric had the effect of minimizing the jury's role as fact finders in violation of Josselyn's right to a fair trial pursuant to the Sixth and Fourteenth Amendments to the United States Constitution. United States v. Jones, 482 F.2d 747 (D.C. Cir. 1973), Zant, 36 F.3d at 538. Standing alone, each of the remarks may not invite reversal, however, cumulatively, the prosecutor's remarks may well have made a difference in the jury's conclusions. As such, reversal is required. Kyles v. Whitley, 514 U.S. 419 (1995).